UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONETTE L. VAZQUEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>CHAD WOLF,<br><br>        Defendant. | Case No. 18-cv-07012-JCS<br><br>**ORDER DENYING MOTION TO DISMISS IN PART SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 91 |

## I. INTRODUCTION

Plaintiff Tonette Vazquez brings this action asserting claims including discrimination, harassment, and retaliation related to her work as a former Transportation Security Officer ("TSO") for the Transportation Security Administration ("TSA"). Defendant Chad Wolf, Acting Secretary of Homeland Security (the "Secretary"), moves to dismiss Vazquez's retaliation and hostile work environment claims—but not her claims for discrimination based on sex and race—under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court finds the matter suitable for resolution without oral argument and VACATES the hearing previously set for June 19, 2020. For the reasons discussed below, the Secretary's motion is DENIED.[1]

## II. BACKGROUND

### A. Procedural History and Previous Order

Vazquez initially filed this action pro se. The case was assigned to the Honorable Elizabeth Laporte. The Secretary moved to dismiss, and the Court dismissed Vazquez's claim under the Rehabilitation Act (and, to the extend her complaint could be construed asserting one,

---

[1] The parties have consented to the undersigned magistrate judge presiding over the case for all purposes pursuant to 28 U.S.C. § 636(c).

her claim under the Fair Labor Standards Act) with prejudice. Order on Mot. to Dismiss ("1st MTD Order," dkt. 53) at 11–12. The Court dismissed Vazquez's remaining claims with leave to amend for failure to include sufficient factual allegations to state a plausible claim on which relief could be granted. *Id.* at 12. Vazquez filed her first amended complaint (dkt. 55), the Secretary filed an answer (dkt. 56), and the Court referred Vazquez to the Federal Pro Bono Project for appointment of counsel (dkt. 59). After Judge Laporte retired from the Court, the case was reassigned to the undersigned magistrate judge in October of 2019. Dkt. 60.[2] Vazquez's counsel was appointed on December 3, 2019. Dkt. 65. By stipulation of the parties, Vazquez filed her operative second amended complaint ("SAC," dkt. 87) on March 16, 2020, and the Secretary now moves to dismiss Vazquez's claims for retaliation and for a hostile work environment. *See generally* Mot. (dkt. 91).

### B. Factual Allegations of the Second Amended Complaint

Because a plaintiff's factual allegations are generally taken as true on a motion under Rule 12(b)(6), this section summarizes the allegations of Vazquez's second amended complaint as if true. Nothing in this order should be construed as resolving any issue of fact that might be disputed at a later stage of the case.

Vazquez "is an African American Latina mother." SAC ¶ 8. She began working as a TSO in September of 2012, screening air travelers and their luggage, and she received very positive performance reviews throughout her tenure with TSA. *Id.* ¶¶ 11–14. She initially felt respected by her colleagues and supervisors, but "felt a drastic change in the workplace environment" after she told a human resources specialist in March of 2013 that she was pregnant, with a due date in November of that year. *Id.* ¶ 15.

After being diagnosed with gestational diabetes in the second trimester of her pregnancy, Vazquez requested a transfer to TSA's "Oakport" office, which handled administrative matters including human resources and training, so that she would have easier access to running water to

---

[2] The case was later briefly assigned to the Honorable Alex Tse, but reassigned again to the undersigned after Judge Tse recused. *See* dkts. 70, 72, 75.

2

wash her hands after handling needles. *Id.* ¶ 17. Other TSA employees who are not members of the same protected class as Vazquez had been permitted to transfer to Oakport for medical reasons during their pregnancies, including an Asian TSA employee. *Id.* ¶¶ 17–18. A human resources specialist initially denied Vazquez's request to transfer on the basis that "gestational diabetes was not an illness." *Id.* ¶ 17. Other African American employees' requests to transfer to Oakport were also denied. *Id.* ¶ 18. Vazquez was later allowed to transfer to Oakport only four days before she began maternity leave. *Id.* ¶ 19.

While Vazquez was pregnant, another TSO made disparaging comments about her weight. *Id.* ¶ 43.

TSA approved Vazquez's request to take maternity leave from November 11, 2013 to February 9, 2014, *id.* ¶ 16, and Vazquez requested that a private room with a sink be available for her to express breast milk when she returned, *id.* ¶ 20. A human resources specialist initially denied Vazquez's request for a room other than a restroom, despite the statutory requirement that such a room be made available. *Id.* ¶ 21. During follow up discussions while Vazquez was on maternity leave, she was told that a room would be available for her. *Id.* ¶ 23.

When Vazquez returned from maternity leave in February of 2014, she was temporarily assigned to Oakport for training, and initially required to use "a small corner of a male supervisor's cluttered desk to express milk." *Id.* ¶ 25. When she later returned to work in the airport terminal, she was moved back and forth between a supervisor's office and a computer control room for her breaks to express milk. *Id.* ¶¶ 26, 30–31. Vazquez was subjected to frequent interruptions by other employees when expressing milk in the supervisor's office, and the computer control room—which she shared with another African American TSO who was nursing—was unsanitary. *Id.* ¶¶ 28–31, 32. When Vazquez complained, a supervisor called her a "janitor" and told her that it was her responsibility to clean the computer control room. *Id.* ¶ 33. According to Vazquez, none of the locations made available to her complied with a TSA handbook's requirement "that '[e]mployees will be provided a place, other than a bathroom, that is *shielded from view and free from intrusion from coworkers and the public* which may be used to express breast milk.'" *Id.* ¶ 34 (quoting the handbook) (alteration and emphasis in SAC).

3

"[S]imilarly situated lactating female employees not of Ms. Vazquez's race and/or national origin were provided private rooms without interruptions to express breastmilk." *Id.* ¶ 77.

Supervisors refused to provide Vazquez with the passcode to the computer control room, requiring her to ask a supervisor to open the door each time she needed to express milk, even though similarly situated male employees, including TSO Steve Paleo, were given the passcode and could enter the room without requesting permission. *Id.* ¶¶ 35–36. The length of Vazquez's breaks was strictly enforced, while other similarly situated employees outside of her protected classes, including Paleo, were allowed to take extended breaks without special permission. *Id.* ¶¶ 27–39. Paleo once told Vazquez "that she was 'a disgrace to the Mexican people.'" *Id.* ¶ 44. Other employees rifled through Vazquez's belongings in the breakroom and in the computer control room, and at times placed her breastmilk equipment in plain view or took and hid her lunch. *Id.* ¶¶ 40–41. A supervisor, Domingo Sanchez, treated Vazquez in a disrespectful manner that he did not use for non-black and non-parenting TSOs, including frequently "instruct[ing] Ms. Vazquez to come to him by pointing to the ground as he were communicating with a dog." *Id.* ¶ 42. At one point in April of 2014, a "Lead TSO" yelled at Vazquez to return to work at the beginning of her break, and refused to allow her to express breastmilk. *Id.* ¶ 45.

In June of 2014, supervisors called a meeting with Vazquez, denied her request for union representation, falsely accused her of taking extended breaks, and required her to set a schedule for expressing milk. *Id.* ¶ 46. Vazquez reported the hostile meeting to a manager, Michael Simmons, "who smirked and told her that he was the one who gave the supervisors permission to call the meeting." *Id.* Simmons told Vazquez "that she 'was not a part of the agency's family,' that she was 'on the outside looking in,' and 'no matter what, the supervisors are always correct.'" *Id.* ¶ 47. In what Vazquez characterizes as a racially charged remark, Simmons yelled at her that she was not going to lose her job because "'not even Obama can take your job away from you!'" *Id.*

Vazquez sent an email about her mistreatment to a human resources officer and on June 30, 2014 initiated the EEO complaint process. *Id.* ¶¶ 48–49. She asserts that harassment and bullying only increased after she did so. *Id.* ¶¶ 50–51.

4

On July 3, 2014, a coworker yelled at Vazquez for taking an oversized container of liquid out of a passenger's bag, even though a supervisor later confirmed that Vazquez was correct to do so. *Id.* ¶ 52. Other employees outside of her protected class were not berated for removing oversized liquids. *Id.* Vazquez requested transfer to a different terminal to avoid the hostile environment, and complained to a manager, but TSA took no action. *Id.* ¶¶ 53–55.

When Vazquez later complained about the lack of privacy for expressing milk in the computer control room, a male supervisor, Khai Pham, became upset and yelled at Vazquez that TSA would not accommodate her. *Id.* ¶ 56. Later the same day, Pham instructed Vazquez to leave her post as a bag checker and pick up other TSOs' trash, which he did not ask of other similarly situated employees outside of Vazquez's protected classes. *Id.* ¶ 57. Supervisors only asked Vazquez and other African American employees to pick up trash. *Id.* ¶ 78.

On July 18, 2014, Vazquez emailed lengthy complaints to TSA officials regarding Pham's conduct and the lack of privacy in the computer control room, including how two supervisors moved her belongings and embarrassed her by placing her breastmilk equipment in plain view. *Id.* ¶ 58. Less than a week later, one of those supervisors refused to open the computer control room for Vazquez to allow her to express milk. *Id.* ¶ 59.

On July 25, 2014, Vazquez alerted supervisor Khai Pham to another TSO's violation of bag check procedures, beginning a chain of events that led to Vazquez's hospitalization:

> Khai Pham responded in a hostile manner, removed Ms. Vazquez as an X-ray operator, and angrily instructed her to move to the bag checker position. After doing so, Ms. Vazquez asked Khai Pham for a restroom break and to speak to a manager, which Khai Pham approved. As she began walking to Terminal One to speak with a manager, however, Khai Pham obstructed her path and forced her to fill out a witness statement report in the presence of two other TSO Supervisors Domingo Sanchez and Jasmine Johnson. When Ms. Vazquez was finally allowed to leave to speak with a manager, she collapsed, suffered a stress-induced seizure, and was taken to a local hospital via ambulance.

*Id.* ¶ 60. Vazquez took medical leave to recover, and her doctor stated in a letter to TSA that she was completely disabled and unable to return to work until November 1, 2014. *Id.* ¶¶ 61–63.

In late August of 2014, TSA personnel wrote Vazquez to ask that she provide written description of the July 25th incident and come to a TSA office to complete paperwork. *Id.* ¶ 65.

Vazquez "timely replied via email, stating: 'I am unable to provide this at this moment. This is to[o] stressful and affecting my health very badly.'" *Id.* ¶ 68 (alteration in original).

TSA terminated Vazquez's employment in a letter dated August 26, 2014 "based on her purported 'failure to follow policies, disrespectful conduct toward multiple supervisors and failure to follow directions from [her] supervisor or other management officials,'" including failure to follow as supervisor's orders on July 25, 2014, and failure to comply with the August 2014 emails asking her to provide a written statement and come to a TSA office. *Id.* ¶ 65. Vazquez asserts that those reasons were inaccurate and pretextual, and that her medical condition prevented her from complying with the August 2014 emails. *Id.* ¶¶ 66–69.

Vazquez asserts four claims under Title VII of the Civil Rights Act of 1964: (1) discrimination based on race, color, and/or national origin, *id.* ¶¶ 70–80; (2) discrimination based on sex, including discrimination based on pregnancy and lactation, *id* ¶¶ 81–91; (3) retaliation, *id.* ¶¶ 92–98; and (4) hostile work environment based on color, race, national origin, sex, pregnancy, and/or lactation, *id.* ¶¶ 99–110. The Secretary's present motion concerns only Vazquez's retaliation and hostile work environment claims.

### C. Parties' Arguments

The Secretary moves to dismiss Vazquez's retaliation claim on the basis that she has not alleged facts plausibly supporting a causal connection between her protected activity and any adverse employment action. Mot. at 7–10. The Secretary moves to dismiss Vazquez's hostile work environment claim for failure to allege conduct sufficiently severe or pervasive to meet the standard for such a claim. *Id*. at 10–15. The Secretary argues that those claims should be dismissed with prejudice because the Court previously dismissed them once, before Vazquez had counsel. *Id.* at 15–16.

Vazquez contends that the Secretary has waived his right to challenge her pleading of the claims at issue, because he filed an answer to the same claims asserted in Vazquez's pro se first amended complaint, before Vazquez was appointed pro bono counsel and filed her present complaint. Opp'n (dkt. 92) at 1–2, 5–6. Vazquez states that the second amended complaint was intended to correct errors in the first amended complaint such as mis-numbered paragraphs and

out-of-order pages. *Id.* at 4. She cites several district court decisions holding that a defendant waived its right to bring a motion under 12(b)(6) by filing an answer to an earlier complaint asserting the same claims. *Id.* at 5–6. The Secretary responds that arguments of failure to state a claim are not waived by filing an answer, citing a Ninth Circuit decision holding that a contrary rule would be both inefficient and ineffective, given that Rule 12(c) specifically permits such arguments after an answer is filed. *See* Reply (dkt. 94) at 2–4 (citing *In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 317–19 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019)). The Secretary asserts that his decision to file a motion to dismiss Vazquez's second amended complaint after answering her first amended complaint was motivated in part by the more lenient pleading standard for a pro se plaintiff no longer applying after Vazquez was appointed counsel. *Id.* at 3–4.

Vazquez also argues that the Court should credit her allegations that the Secretary took adverse action against her because of her protected activity, and that temporal proximity—and particularly what she considers a pattern of adverse action occurring after protected activity—plausibly support that conclusion. Opp'n at 7–11. Vazquez contends that one of the cases on which the Secretary relies is distinguishable both on its facts and in that it was decided on summary judgment, not a motion to dismiss. *Id.* at 11–12 (discussing *Grosz v. Boeing Co.*, 455 F. Supp. 2d 1033 (C.D. Cal. 2006)).

Vazquez argues that she has sufficiently alleged a hostile work environment based on pervasive harassment, including but not limited to daily indignities related to her and another African American employee being assigned an "unsanitary computer control room to express their breastmilk," and only African American employees being instructed to pick up other employees' trash, with her mistreatment ultimately leading to a seizure requiring absence from work. *Id.* at 11–17. As with the retaliation claim, Vazquez argues that the Secretary inappropriately relies on cases decided on summary judgment or after trial, which are also distinguishable on their facts in that they "largely involve[d] isolated incidents of conduct." *Id.* at 17–18.

The Secretary argues in his reply that the retaliation and hostile work environment claims should be dismissed because Vazquez has not added new allegations beyond those held

7

insufficient in her original complaint. Reply at 5–6, 9. The Secretary contends that temporal proximity alone is not sufficient to support an inference of retaliation, and that some the cases on which Vazquez relies applied a more lenient pleading standard to complaints filed pro se. *Id.* at 6–9. The Secretary argues that Vazquez's opposition brief exaggerates her allegations of a hostile work environment (for example, according to the Secretary, Vazquez's allegation that she was required to express milk at a supervisor's desk describes a temporary arrangement that was soon changed), that she alleges only discrete acts rather than pervasive conduct, and that she cannot rely on the same conduct to support both her discrimination claims and her hostile work environment claim. *Id.* at 9–13.

### III.   ANALYSIS

#### A.   Legal Standard Under Rule 12(b)(6)

A complaint may be dismissed for failure to state a claim on which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a claimant's burden at the pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that a "pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

In ruling on a motion to dismiss under Rule 12(b)(6), the court takes "all allegations of material fact as true and construe[s] them in the light most favorable to the non-moving party." *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A pleading must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "[C]ourts 'are not

bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Rather, the claim must be "'plausible on its face,'" meaning that the claimant must plead sufficient factual allegations to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 570).

### B. Relevance of the Previous Order

The Secretary argues that Vazquez's retaliation and hostile work environment claims include no more specific allegations than she had presented in her original complaint, which the Court dismissed. *See* Reply at 5–6, 9. The Court's previous order dismissed Vazquez's claims for failure to include sufficient factual allegations showing that employees who were not members of her protected class were treated differently. 1st MTD Order at 12. The Court did not reach the question of whether Vazquez had alleged sufficiently severe or pervasive conduct to support a hostile work environment claim. That order also did not include any analysis of Vazquez's retaliation claim. The Court declines to read the previous order as squarely addressing these issues.

Alternatively, even if the previous order considered these issues, the Court lacked the benefit of full briefing by counsel at that time, and reconsideration is appropriate. *See Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1042–43 (9th Cir. 2018) (holding that the "law of the case doctrine does not . . . bar a court from reconsidering its own orders before judgment is entered or the court is otherwise divested of jurisdiction over the order," and after the filing of an amended complaint, a "district court [is] free to correct any errors or misunderstandings without having to find that its prior decision was 'clearly erroneous'" (citation omitted)).

### C. Retaliation

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any

manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). In general, employers' "unlawful employment practices" under Title VII encompass discrimination and harassment based on "race, color, religion, sex, or national origin." *See id.* § 2000e-2(a). As a result of the Pregnancy Discrimination Act, sex discrimination under Title VII incorporates "pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k)(2), which courts have generally held includes lactation. *See, e.g.*, *EEOC v. Houston Funding II, Ltd.*, 717 F.3d 425, 428 (5th Cir. 2013).

"To succeed on a retaliation claim, [a plaintiff] must first establish a prima facie case [by] demonstrat[ing] (1) that she was engaging in a protected activity, (2) that she suffered an adverse employment decision, and (3) that there was a causal link between her activity and the employment decision." *Trent v. Valley Elec. Ass'n, Inc.*, 41 F.3d 524, 526 (9th Cir. 1994). The Ninth Circuit has long held that "a plaintiff does not need to prove that the employment practice at issue was in fact unlawful under Title VII," but instead "must only show that she had a 'reasonable belief' that the employment practice she protested was prohibited under Title VII." *Id.* Making an internal "complaint that a supervisor has violated Title VII may constitute protected activity for which the employer cannot lawfully retaliate." *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009); *see also Trent*, 41 F.3d at 526 ("We have held that when an employee protests the actions of a supervisor such opposition is a 'protected activity.'"). A plaintiff must ultimately prove but-for causation, or in other words, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Here, taking Vazquez's allegations as true, she was fired as a direct result of an incident where she attempted to report what she viewed as impermissible harassment to a supervisor—specifically, her July 25, 2014 effort to report Khai Pham's reprimand and reassignment of her after she reported another TSO's improper search. *See* SAC ¶¶ 60, 65. Vazquez has previously objected to Pham requiring her to pick up trash, which he did not require of non-African American TSOs. *Id.* ¶¶ 57–58, 78. TSA cited the July 25, 2014 incident and "disrespectful conduct toward multiple supervisors" as among the reasons for her termination. *Id.* ¶ 65. Viewing the complaint

in the light most favorable to Vazquez, it is reasonable to infer that Vazquez's objection to what she considered harassment based on race and sex might have been construed by TSA supervisors as "disrespectful."

This is not a case of mere temporal proximity—but even if it were, the cases that the Secretary cites do not stand for a rule that temporal correlation can never support a reasonable inference of retaliation, but instead that "'timing alone will not show causation in all cases.'" Reply at 7 (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002)). To the contrary, the same case cited by the Secretary states that "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity," so long as "the termination . . . occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (citations and internal quotation marks omitted). Here, among other incidents, Pham reassigned Vazquez to pick up trash on the same day that Vazquez had voiced her concerns to him about the inadequate rooms provided for her to express milk, SAC ¶¶ 56–57, Pham angrily reassigned her from x-ray operation to bag checking one week after she emailed higher ranking supervisors about Pham assigning her to pick up trash and "treat[ing her] like a slave," *id.* ¶¶ 48, 60, and Vazquez was fired while she was on medical leave from the seizure she suffered while trying to report what she viewed as improper conduct by Pham, *id.* ¶¶ 60, 64. Under the circumstances of this case, temporal proximity supports a sufficient inference of retaliation to proceed beyond the pleadings.

Vazquez has alleged facts plausibly supporting an inference of retaliation. The motion to dismiss this claim is DENIED.

### D. Hostile Work Environment

"[Discriminatory] harassment so 'severe or pervasive' as to 'alter the conditions of [the victim's] employment and create an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically

11

1  threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes
2  with an employee's work performance." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71
3  (2001) (per curiam) (citations and internal quotation marks omitted). "A plaintiff must show that
4  the work environment was both subjectively and objectively hostile." *McGinest v. GTE Serv.*
5  *Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).

6        The "standards for judging hostility are sufficiently demanding to ensure that Title VII
7  does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citation omitted). Rather,
8  "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*
9  Although a workplace need not be "so heavily polluted with discrimination as to destroy
10  completely the emotional and psychological stability of minority group workers" to be actionable,
11  "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work
12  environment—an environment that a reasonable person would find hostile or abusive—is beyond
13  Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal
14  quotation marks omitted). "Repeated derogatory or humiliating statements, however, can
15  constitute a hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000).

16        "To hold her employer liable for [discriminatory] harassment under Title VII, [a plaintiff]
17  must show that she reasonably feared she would be subject to such misconduct in the future
18  because the [employer] encouraged or tolerated [the] harassment." *Brooks v. City of San Mateo*,
19  229 F.3d 917, 924 (9th Cir. 2000).

20        According to the Secretary, the "issue here . . . is whether any of the alleged discreet [sic]
21  acts of discrimination meet the severe or pervasive requirement required for a hostile work
22  environment claim." Reply at 13. The Secretary's apparent position that acts of alleged
23  mistreatment must be evaluated individually runs counter to the concept of a hostile work
24  *environment*. "Workplace conduct is not measured in isolation . . . ." *Nat'l R.R. Passenger Corp.*
25  *v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Breeden*, 532 U.S. at 270) (ellipsis in original).

26        To the extent that a line of District of Columbia cases cited by the Secretary suggest that
27  conduct underlying a discrimination claim cannot also support a claim for hostile work
28  environment, *see* Mot. at 12–13 (citing, *e.g.*, *Dudley v. Wash. Metro. Area Transit Auth.*, 924 F.

Supp. 2d 141, 164 (D.D.C. 2013)[3]), this Court respectfully disagrees that such a rule is consistent with the holistic approach endorsed by the Ninth Circuit and the Supreme Court. *See, e.g.*, *McGinest*, 360 F.3d at 1112–13 (holding that courts must consider hostile work environments "in light of 'all the circumstances'" (quoting *Nichols v. Azteca Rest. Enter.*, 256 F.3d 864, 872 (9th Cir. 2001)). As Judge Chen held in a decision cited by Vazquez, "differential treatment may be considered as part of a hostile work environment claim," and the evaluation of such a claim "is informed by the totality of the circumstances." *Velez v. Roche*, 335 F. Supp. 2d 1022, 1031 (N.D. Cal. 2004) (also quoting *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001), for the principle that "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct" (alteration in original)). The Secretary somewhat strangely attempts to distinguish *Velez* on the basis that it cites a Ninth Circuit case considering discrimination based on race rather than gender. Reply at 13 (discussing *McGinest*, 360 F.3d 1103). That distinction is of no consequence, both because "[h]ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment," *Morgan*, 536 U.S. at 116 n.10, and because Vazquez asserts a theory of racial discrimination (in addition to gender discrimination) in this case.

      The Secretary also appears to confuse aspects of Vazquez's allegations. The Secretary asserts, for example, that Vazquez's experience with interruptions while expressing milk in a supervisor's office was limited to a single day because she alleges that she complained about those interruptions and was instructed to use the computer control room the same day she returned to work, Reply at 10 (citing SAC ¶¶ 24–25, 27–30), but apparently overlooked Vazquez's allegation that "[t]hereafter, [she] was moved back and forth between the Terminal 2 Supervisor's Office and

---

[3] As stated in *Dudley* the District Court for the District of Columbia "'frown[s] on plaintiffs who attempt to bootstrap their alleged discrete acts of retaliation into a broader hostile work environment claim," and in some cases has "even gone as far as to state that 'Plaintiff cannot [ ] rely on discrete acts upon which he bases his discrimination and retaliation claims to support a hostile work environment claim.'" *Dudley*, 924 F. Supp. 2d at 164 (quoting *Baloch v. Norton*, 517 F. Supp. 2d 345, 364 (D.D.C. 2007); *Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56–57 (D.D.C. 2011)) (second alteration in original).

13

the computer control room to express milk," SAC ¶ 31.

Looking to her complaint as a whole, Vazquez alleges that after generally feeling respected by her colleagues before her pregnancy, she was, among other things: (1) denied accommodations provided to employees of other races when she announced she was pregnant,[4] *id.* ¶¶ 17–18; (2) provided only either a shared office where she suffered daily interruptions or an unsanitary computer room to express milk, when employees of other races received more appropriate facilities, *id.* ¶¶ 26–32, 77; (3) not allowed to know the passcode to the computer control room where she expressed milk, even though similarly situated male TSOs were given the passcode, *id.* ¶¶ 35–36; (4) called a "janitor" by one supervisor and assigned by another to pick up other TSOs' trash, when employees of other races were not required to pick up trash, *id.* ¶¶ 33, 57, 78; (5) more strictly limited in taking breaks than other employees outside her protected classes, *id.* ¶¶ 37–39; (6) subjected to searches of her belongings by other employees in both the breakroom and the computer control room, exposing her lactation equipment in an embarrassing manner, *id.* ¶¶ 40–41, 58; and (7) told by a manager "that she 'was not a part of the agency's family'" and "that she was 'on the outside looking in,'" *id.* ¶ 47. Vazquez eventually "suffered a stress-induced seizure" that required an ambulance to take her to a hospital. *Id.* ¶ 60.

For the purpose of Vazquez's hostile work environment claim, the Secretary does not challenge whether she has sufficiently alleged that her purported mistreatment was motivated by her membership in a protected class, but only whether it was "severe or pervasive" enough to constitute a violation of Title VII. Taking Vazquez's allegations together, the Court is satisfied that she has described "an environment that a reasonable person would find hostile or abusive," *Harris*, 510 U.S. at 21, and that could fairly be characterized as "a change in the terms and conditions of employment," *Faragher*, 524 U.S. at 788. The Secretary's motion to dismiss this

---

[4] The Secretary argues that the initial denial of transfer to Oakport cannot support a hostile work environment claim because Vazquez "was transferred to Oakport before she returned from maternity leave." Reply at 10. (Vazquez in fact alleges that she transferred shortly before she *began* maternity leave, SAC ¶ 19, but the difference is immaterial.) The Court disagrees. Vazquez alleges that she requested a transfer in her second trimester, was initially denied, and was not allowed to transfer until shortly before her due date—by definition, some months after her second trimester. SAC ¶¶ 17, 19.

claim is DENIED.

## IV. CONCLUSION

For the reasons discussed above, the Secretary's motion is DENIED.  Because the Court concludes that Vazquez's allegations are sufficient, the Court declines to reach her argument that the Secretary's answer to a previous complaint waived any argument now presented.

**IT IS SO ORDERED.**

Dated: June 17, 2020

JOSEPH C. SPERO
Chief Magistrate Judge